IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BRUCE HUDSON, RAYMOND CHOP, AND ERIC PASSANNANTE, individually and on behalf of all others similarly situated, | )<br>)<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| vs. | ) No. 07 C 590<br>) |
| AIR LINE PILOTS ASSOCIATION INTERNATIONAL, | )<br>)<br>) |
| Defendant, | )<br>) |
| UNITED AIRLINES, INC., | )<br>) |
| Intervenor. | )<br>) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

The plaintiffs in this case are pilots currently or formerly employed by United Airlines, Inc. (United) who contend, on behalf of themselves and a certified class, that their union, the Air Line Pilots Association International (ALPA), breached its duty of fair representation under the Railway Labor Act, 45 U.S.C. § 152 (RLA). Plaintiffs contend that ALPA breached its duty of fair representation by acting in an arbitrary manner, by discriminating against certain furloughed pilots based on a bias against them, and by acting in bad faith. The Court granted United leave to intervene in the case. ALPA, United, and plaintiffs have moved for summary judgment. For the following reasons, the Court denies United's and plaintiffs' motions and grants ALPA's motion.

**Facts**

On cross-motions for summary judgment, the Court construes facts and draws inferences "in favor of the party against whom the motion under consideration is made." *In re United Air Lines, Inc.*, 453 F.3d 463, 469 (7th Cir. 2006).

**1.     ALPA and furloughed United pilots**

ALPA is a labor union subject to the provisions of the RLA. It functions as the bargaining representative for pilots employed by United. The decisions challenged in this lawsuit were made by ALPA's United Airlines Master Executive Council (MEC). The MEC is comprised of fifteen United pilots who vote on issues collectively affecting United pilots, elected from eight local councils. The MEC appointed several pilots to serve on its Retirement and Insurance Committee (RIC). The RIC provided the MEC with substantive recommendations regarding employee compensation and benefits and also acted as a conduit for information between the MEC and outside consultants.

Following the September 11, 2001 terrorist attacks, United encountered financial difficulties. During the course of its financial troubles, United furloughed a number of its pilots. From 2001 to 2004, United furloughed nearly 2,200 pilots. In November 2004, United began periodically recalling back to work pilots who had been furloughed. Pursuant to their collective bargaining agreement, furloughed pilots had the option to bypass a recall offer one time, thereby deferring their return to United. A furloughed pilot could defer recall until there were no remaining furloughed pilots junior to him, at which time the pilot could accept recall or have his employment terminated. Many furloughed pilots deferred recall to accommodate personal concerns or to obtain more

favorable work conditions (e.g., flying more desirable routes) by accepting recall at a later date. Upon return, furloughed pilots were required to attend a recall class and engage in flight training.

**2.     Distribution of the proceeds of United notes**

In 2002, United filed for bankruptcy protection. As part as its efforts to reorganize in bankruptcy, United sought to terminate its pilots' defined benefit pension plan, known as the A Plan. In December 2004, the MEC approved a new collective bargaining agreement that provided that ALPA would not oppose United's efforts to terminate the A Plan. The new agreement created a defined contribution retirement plan for the pilots, known as the C Plan. United also agreed to issue $550 million of convertible notes to the pilots, though the agreement did not specify how the proceeds of those notes should be apportioned among the pilots. The agreement provided that "the Notes or the value of the Notes [were] to be distributed . . . as soon as reasonably practicable given tax, accounting, securities and market considerations." Pls.' Resp. to ALPA's Local Rule 56.1 Statement ¶ 19. The agreement also did not specify whether furloughed pilots would be eligible to share in the proceeds of the notes. A majority of United's pilots approved the new collective bargaining agreement. Plaintiffs do not challenge the adoption of the new agreement.

From January 2005 to January 2006, the MEC, with the aid of the RIC and outside actuarial consultants, met several times to analyze, discuss, and debate how the proceeds from the sale of the United notes should be allocated among United's pilots. This process included considering whether furloughed pilots would share in that

3

distribution. The MEC's members also consulted with ALPA's attorneys during the allocation process, specifically inquiring about their legal duties, including the duty of fair representation.[1] In its meetings, the MEC received and discussed information pertaining to pilots' eligibility to share in the proceeds of the convertible notes, including, among other things, the status of furloughed pilots. Those meetings took place in January, July, September, October, and November 2005, before the MEC made a final decision in January 2006.

At the January 2006 MEC meeting, the RIC recommended that furloughed pilots with a recall date of February 1, 2006 or earlier should be eligible to receive note proceeds. During that meeting, the MEC discussed the administrative tasks necessary to distribute the note proceeds. Actuarial consultants informed the MEC that they needed to know the identity of participants in the note proceeds at least two months prior to distribution. United also required this information one month before distribution.

During the January 2006 meeting, the MEC also discussed uncertainty over whether furloughed pilots would choose to return to United. The MEC was aware that significant numbers of pilots at that point had bypassed their recall offers, creating doubt as to which pilots eventually would return to United and when they would do so. This was important because pilot service dates were required under the allocation methodology the MEC had selected to distribute the note proceeds. The MEC also discussed setting aside some of the proceeds of the notes to hold until it could be determined which furloughed pilots would return to work at United.

---

[1]ALPA has disclaimed relying on advice of counsel as an affirmative defense.

ALPA has presented evidence that its legal counsel advised the MEC that setting aside funds for furloughed pilots could cause two types of problems: (1) risk that the funds could be lost if United went back into bankruptcy; and (2) tax complications with the IRS. Though plaintiffs deny this contention, the evidence they cite does not refute it. *See* Pls.' Resp. to ALPA's Local Rule 56.1 Statement ¶ 37. For example, the deposition testimony plaintiffs cite details advice regarding whether furloughed pilots had to be included in or excluded from the distribution of the note proceeds. It does not, however, support plaintiffs' denial regarding bankruptcy and tax issues. Similarly, the deposition testimony of Jeffrey Barath, cited by plaintiffs for the proposition that the MEC's only concern was that United could fall back into bankruptcy and not tax issues, indicates that the MEC was concerned about and received advice regarding tax issues. ALPA's Local Rule 56.1 Statement, Ex. 19 at 413:15-415:22.

At the January 20, 2006 MEC meeting, a subcommittee of the MEC proposed the following resolution regarding the eligibility of furloughed pilots to participate in the proceeds from the sale of the United notes:

> BE IT RESOLVED, notwithstanding the general eligibility rule established for convertible note proceeds, the following eligibility rules will apply specifically to currently furloughed pilots:
>
> 1) The pilot must be offered a recall class (and subsequently agree to accept that offer) that was officially announced by UAL by the [United's] Bankruptcy Exit Date, regardless of the date the class is scheduled to begin,
>
> 2) If the pilot had previously bypassed an offer of recall, she/he is ineligible unless she/he meets the provisions of item (1) above . . . .

Pls.' Resp. to ALPA's Local Rule 56.1 Statement ¶ 44. The MEC unanimously adopted

the resolution. As a result, furloughed pilots were eligible to receive proceeds from sale of the notes so long as they had accepted an offer of recall before the date on which United exited bankruptcy, even if their recall class was not scheduled to begin until a later date. One of ALPA's attorneys testified that, to the best of his knowledge, the MEC did not reconsider its eligibility determination with respect to furloughed pilots after January 2006.

United exited bankruptcy on February 1, 2006. Prior to that date, the chairman of the MEC, Mark Bathurst, contacted United's senior vice president of flight operations to request that United schedule and announce as many pilot recall classes as possible prior to the bankruptcy exit date.[2] As a result, pilots in recall classes through May 1, 2006 were eligible to share in the note proceeds, even if they were still furloughed as of February 1, 2006. Ultimately, the proceeds from the notes distributed to pilots totaled approximately $542 million. The proceeds were distributed in two phases for tax reasons. Eligible United pilots received approximately $351 million in August 2006 and another $191 million in March 2007. The second payment included a $30 million reserve to cover errors and omissions. After errors and omissions were accounted for, the balance of the $30 million reserve was distributed based on the allocation methodology.

In support of its contention that the MEC was biased against furloughed pilots, plaintiffs focus on an excerpt of a statement contained in an affidavit submitted by

---

[2]Plaintiffs admit this fact but deny "any argument that as many furloughed pilots as possible were included." They do not, however, offer any evidence to support that contention.

Bathurst during an earlier point in this case: "historically in the airline industry, few if any, benefits, [sic] were given to furloughees." ALPA's Resp. to Pls.' Local Rule 56.1 Statement ¶ 6. Though he made that statement, its meaning becomes more readily apparent when examined in context of Bathurst's entire declaration:

> During the debate [at the January 2006 MEC meeting], I heard the following issues raised by MEC members . . . .
>
> Mention was made of the fact that historically in the airline industry few, if any, benefits, were given to furloughees. The MEC had already elected to provide them with equity and had negotiated pass benefits for them. Additionally, the United pilots had determined to assess themselves an amount sufficient to provide medical benefits to those furloughees not covered under some other plan . . . .

Pls.' Local Rule 56.1 Statement Ex. 6 ¶ 8. In the same paragraph of that affidavit, Bathurst also mentioned concerns regarding whether furloughed pilots would return to United upon recall and regarding tax issues pertaining to the proceeds of the notes.

Approximately 950 furloughed pilots who eventually returned to United were ineligible to receive any of the proceeds of the notes pursuant to the MEC's January 2006 decision. Those pilots were ineligible to receive any of the note proceeds because they had not accepted recall offers prior to United's bankruptcy exit date. Named plaintiffs Hudson, Chop, and Passannante were furloughed United pilots who did not receive a share of proceeds of the notes. Each had been offered recall prior to United's bankruptcy exit date but had declined to return on the first date he was able to do so. They brought this action under the RLA and moved to certify a class of similarly situated United pilots. The Court granted plaintiffs' motion for class certification, defining the class as "United pilots who had not been offered or accepted recall as of

United's February 1, 2006 exit from bankruptcy and did not receive a share of the note proceeds." *Mansfield v. Air Line Pilots Ass'n Int'l*, No. 06 C 6869, 2006 WL 2048664, at *6 (N.D. Ill. July 9, 2007).

## Discussion

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). To determine whether a genuine issue of material fact exists, the Court must view the record in the light most favorable to the nonmoving party and draw reasonable inferences in that party's favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986); *Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 471 (7th Cir. 2002). A genuine issue of triable fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

**1.    United's bankruptcy plan**

ALPA and United first contend that they cannot be held liable in this action based on an exculpation clause contained in United's plan of reorganization. In January 2006, a bankruptcy court judge confirmed that plan. United's plan of reorganization included ALPA as an "exculpated party" and provided that exculpated parties could not be held liable for "exculpated claims," defined as "[a]ny Claim related to any act or omission in connection with the Debtors' restructuring, . . . or the property to be distributed pursuant to the Plan." United's Local Rule 56.1 Statement, Ex. H at 14-15. A subsection of

8

Article X of the plan, dealing with the effect of plan confirmation, provides that "no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Exculpated Claim, except for gross negligence or willful misconduct . . . ." *Id.* at 121.

In a previous ruling in the related case of *Mansfield v. Air Line Pilots Association International*, the Court concluded that "[t]he words 'intentional' and 'willful' are synonyms, for all practical purposes." *Mansfield*, 2006 WL 2048664, at *3 (citing *Webster's Third New International Dictionary* 2617 (1993)); *see also Mansfield v. Airlines Pilots Ass'n Int'l*, No. 06 C 6869, 2009 WL 2386281, at *3-4 (N.D. Ill. July 29, 2009). Similarly, "bad faith," defined by Black's Law Dictionary as "dishonesty of belief or purpose," would come within the exception to the exculpation clause. *Black's Law Dictionary* 134 (7th ed. 1999). Plaintiffs contend that the conduct challenged in this case constitutes gross negligence and willful conduct, taking it outside of the terms of the plan's exculpation clause. Accordingly, ALPA and United are not entitled to summary judgment based on the United's plan, because the claims alleged by plaintiffs, if proven, would fall outside the scope of that plan.

**2.      United's motion**

In its separate motion for summary judgment, United notes that the only claim raised in plaintiffs' complaint "is for breach of the duty of fair representation against ALPA." United's Mem. in Support of Mot. for Summ. J. at 2. Based on this fact, United contends it is entitled to summary judgment "[t]o the extent any Plaintiff is raising or could raise any claim against United." *Id.* There is no viable basis for this request.

United intervened in this case, in part, to protect itself against any derivative liability it might incur in the event ALPA is found to have breached its duty of fair representation. Plaintiffs, however, have not attempted to state any claim against United, and there is no live dispute between plaintiffs and United before the Court. Under these circumstances, it would be inappropriate for the Court to declare that none of the plaintiffs, either individually or as a class, have any sort of claim against United. *E.g.*, *Hinrichs v. Whitburn*, 975 F.2d 1329, 1333 (7th Cir. 1992) (noting the well established rule that courts may not "render advisory opinions"); *Civix-DDI, LLC v. Cellco P'ship*, 387 F. Supp. 3d 869, 881 (N.D. Ill. 2005) (noting that parties are not entitled to summary judgment on unasserted claims).

3. **ALPA's duty of fair representation**

Pursuant to the RLA, a union owes its members a duty of fair representation. *E.g.*, *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67 (1991). "[A] union breaches its duty of fair representation if its actions are either 'arbitrary, discriminatory, or in bad faith.'" *Id.* (quoting *Vaca v. Sipes*, 386 U.S. 171, 190 (1967)); *see also Griffin v. Air Line Pilots Ass'n, Int'l*, 32 F.3d 1079, 1083 (7th Cir. 1994). Plaintiffs contend that ALPA is liable under all three aspects of the duty of fair representation.

    a. **Arbitrariness**

With respect to a claim of arbitrariness, review of a union's actions "is very deferential." *Id.* "[T]he final product of the bargaining process may constitute evidence of a breach of duty only it if can be fairly characterized as so far outside a wide range of reasonableness that it is wholly irrational or arbitrary." *O'Neill*, 499 U.S. at 1136. "This

wide range of reasonableness gives the union room to make discretionary decisions and choices, even if those judgment are ultimately wrong." *Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 45-46 (1998) (internal quotations marks omitted); *see also Trnka v. Local Union No. 688*, 30 F.3d 60, 61 (7th Cir. 1994) (characterizing the test for arbitrariness as "quite forgiving"). The fact that the MEC chose an allocation method that excluded many furloughed pilots from eligibility to receive the proceeds of the notes is not by itself indicative of a breach of the duty of fair representation. *See O'Neill*, 499 U.S. at 1136; *Rakestraw v. United Airlines, Inc.*, 981 F.2d 1524, 1529-30 (7th Cir. 1992).

ALPA is entitled to summary judgment on plaintiffs' claim pertaining to the MEC's January 2006 decision because no reasonable jury could conclude that its conduct with respect to the eligibility of furloughed pilots to receive a share of the proceeds of the notes was wholly irrational. To the contrary, the undisputed evidence shows that the MEC and its members contemplated the issue for over a year, examined a number of alternatives, and discussed the issue extensively and repeatedly among themselves, with the RIC, with outside actuaries, and with legal counsel.[3] The MEC's analysis included consideration of several important problems, including tax issues, the risk of

---

[3]At first blush, this conclusion might appear to conflict with the Court's ruling on ALPA's motion for summary judgment in the related *Mansfield* litigation. In that case, the Court concluded that there are genuine issues of material fact regarding whether the MEC engaged in a meaningful analysis of options for distributing the note proceeds or whether that process was a sham designed to provide cover for a preordained outcome. *See Mansfield*, 2009 WL 2386281, at *2-3. In the present case, however, plaintiffs have presented no evidence from which a jury reasonably could find there was a sham process. Indeed, the vast majority of the facts concerning the process utilized by the MEC are uncontested.

United holding the money for a long period, the time required for ALPA's actuaries and United to process pilot information to distribute the funds, and whether furloughed pilots would actually accept recall and return to work at United.[4] Taking account of all these concerns, the MEC made an eligibility decision that included some furloughed pilots in the distribution of the note proceeds but excluded others. Though plaintiffs identify a number of alleged flaws with the MEC's decision, they have failed to provide any evidence or cite any authority from which a jury reasonably could find that the MEC's decision was wholly irrational.

Plaintiffs contend that "ALPA had no legitimate interest in excluding later returned furloughees." Pls.' Resp. at 14. This argument is based on the idea that there was no reason to distinguish between furloughees who accepted recall after February 1, 2006 and furloughees who never accepted recall. ALPA correctly notes, however, that at the time it made its eligibility determination, the MEC had no way of knowing which furloughed pilots ultimately would accept recall – a concern that plaintiffs acknowledge was valid. Indeed, forty-one percent of furloughees had bypassed their first recall opportunity as of January 2006. A union's decision is reviewed for arbitrariness "in light of the factual and legal landscape at the time of the union's actions." *O'Neill*, 499 U.S. at 67; *see also Thompson v. United Trans. Union*, 599 F. Supp. 2d 11075, 1085 (N.D. Iowa 2008). The distinction between later returning furloughees and those that never returned is not meaningful when evaluating the MEC's January 2006 decision, because at that time the distinction did not exist.

---

[4]Plaintiffs concede that it was proper for ALPA to exclude furloughees who did not accept recall from receiving a share of the note proceeds.

Plaintiffs also contend that it was arbitrary and irrational for the MEC not to set aside funds from the note proceeds to distribute to furloughees who accepted recall after United's bankruptcy exit date. As detailed above, the MEC considered setting aside such funds but was counseled against doing so due to tax concerns and the risk that the money set aside, which would need to be held by United for tax reasons, could be lost if United went back into bankruptcy. Regardless of whether these concerns ultimately proved correct, no jury reasonably could find that they were anything other than legitimate reasons for the MEC to decide against setting aside funds to distribute to later returning furloughees. *See Rakestraw*, 981 F.2d at 1533 ("[A] mistake in judgment does not violate the duty of fair representation.").

To support their contention that ALPA should have created a set-aside fund, plaintiffs point out that such a fund was created for pilots on leave for military service. That fund was held by United. Though ALPA elected to set aside funds for one group of pilots but not another, its decision was not arbitrary. Pursuant to the Uniformed Services Employment and Reemployment Rights Act, 38 U.S.C. § 4301, ALPA was required to take steps to ensure that any pilots on military leave were able to return to work and that they received the same the tax benefits available to pilots working for United during the time of their leave. Though ALPA set aside funds in one instance in order to comply with its obligations under a federal statute, that does not mean it was required to do so in all instances, and it does not undermine the rational reasons ALPA had for not setting aside funds for furloughed pilots.

Plaintiffs also contend that ALPA breached its duty of fair representation by not

13

revisiting the January 2006 decision at a later date, specifically by not distributing the balance of the $30 million errors and omissions fund to pay later returning furloughees. ALPA responds that the duty of fair representation did not require it do so, primarily by pointing out the difficulty of creating a definite rule in such situations (e.g., which past decisions should a union be obligated to review, and when and how often should it be obligated to review them). Plaintiffs do not cite any authority imposing a rule that the duty of fair representation requires a union to revisit in light of later events decisions that were appropriate when made.

Additionally, plaintiffs have not presented any evidence from which a reasonable jury could conclude that it was wholly irrational for the MEC not to reallocate money from the errors and omissions fund to the furloughed pilots. There is no evidence that the MEC was authorized and had the right or ability to alter its January 2006 eligibility determination at a later date. Similarly, plaintiffs do not present any evidence that anyone requested that the MEC or ALPA revisit the issue before the March 2007 distribution was made. Rather, ALPA was confronted with this issue at gunpoint, when plaintiffs filed this case and moved for a temporary restraining order, a motion they subsequently withdrew.

Instead of presenting evidence concerning these points, plaintiffs simply note that there was a positive balance in errors and omissions fund (without identifying the size of the balance) and contend it was arbitrary not to distribute that money to furloughed pilots. But that fact was unknown to the MEC at the time it made the eligibility decision in January 2006. Again, plaintiffs have presented no authority that a

14

union is required to revisit earlier decisions, no evidence concerning ALPA's ability to revisit its January 2006 decision, and no evidence demonstrating that ALPA and the MEC were asked to revisit the January 2006 decision.

### b. Discrimination and bad faith

Plaintiffs also contend that the MEC's actions violated ALPA's duty of fair representation by discriminating against furloughees. In support of their contention, they cite the excerpt in Bathurst's affidavit that notes few benefits were historically given to furloughees in the airline industry as a whole. That statement by Bathurst is insufficient as a matter of law to establish that ALPA discriminated against plaintiffs. No reasonable jury could conclude otherwise.

To succeed on the discrimination prong of the duty of fair representation, a plaintiff must present evidence of "invidious" discrimination. *E.g.*, *Ooley v. Schwitzer Div., Household Mfg Inc.*, 961 F.2d 1293, 1304 (7th Cir. 1992); *Jordan v. United States Postal Serv.*, 488 F. Supp. 2d 766, 774 (N.D. Ill. 2007). As explained above, the MEC was unsure which of those pilots would eventually return to work and had to make decisions regarding distribution of the note proceeds that balanced a number of interests and risks. Based on its analysis, the MEC had rational reasons for treating differently furloughed pilots who had not accepted recall as of United's exit from bankruptcy. "Slapping the label 'bad faith' or 'discrimination' on a classification that is rationally related to a legitimate objective" does not create the basis for a duty of fair representation claim. *Rakestraw*, 981 F.2d at 1532. Plaintiffs do not explain how a single statement by the MEC's chairman regarding the historical treatment of

15

furloughed pilots in the industry generally can constitute substantial evidence of invidious discrimination against plaintiffs in this particular situation. No reasonable jury could conclude, based on the evidence presented by plaintiffs, that ALPA breached its duty of fair representation by invidiously discriminating against furloughed pilots.[5]

Plaintiffs' bad faith claim fails for the same reasons as their discrimination claim. A bad faith claim requires "substantial evidence of fraud, deceitful action or dishonest conduct." *Amalgamated Ass'n of St. Elec. Ry. & Motor Coach Employees of Am. v. Lockridge*, 403 U.S. 274, 299 (1971) (quotation omitted). Plaintiff have not presented evidence of any such conduct by ALPA or the MEC members. They again rely on the general statements contained in Bathurst's affidavit. To the contrary, the uncontested facts demonstrate that Bathurst contacted United to ask it to schedule as many recall classes as possible months in advance, so that more furloughed pilots would be recalled before United's bankruptcy exit date. This enabled more furloughed pilots to become eligible for a share of the note proceeds. No reasonable jury could conclude, based on the evidence presented by plaintiffs, that ALPA breached its duty of fair representation by acting in bad faith.

**Conclusion**

For the foregoing reasons, the Court denies the United's and plaintiffs' motions for summary judgment [# 137, 150]. The Court grants ALPA's motion for summary

---

[5]Notably, plaintiffs spend less than one-half of a page out of their twenty-three page brief discussing their discrimination claim.

judgment [# 141].  The clerk is directed to enter judgment in favor of the defendants.

_____
              MATTHEW F. KENNELLY
              United States District Judge

Date:  September 15, 2009